UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| MICHELLE SHULSE, ON | ) | |
| BEHALF OF ERIC SHULSE, | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | Civil No. 3:19-CV-30146-KAR |
| | ) | |
| | ) | |
| WESTERN NEW ENGLAND | ) | |
| UNIVERSITY, et al., | ) | |
| Defendants. | ) | |

MEMORANDUM AND ORDER ON DEFENDANTS'
MOTION TO DISMISS AND MOTION TO STRIKE EXTRINSIC EVIDENCE
SUBMITTED WITH DEFENDANTS' RULE 12(b)(6) MOTION TO DISMISS
(Dkt Nos. 7 and 9)

ROBERTSON, U.S.M.J.

Eric Shulse ("Shulse"), through his Guardian Michelle Shulse ("Plaintiff"), brings this action against the defendants Western New England University ("WNEU"), WNEU President Anthony S. Caprio ("Caprio"), and the Board of Trustees of WNEU ("the Board") (collectively, "Defendants") alleging federal claims under § 504 of the Rehabilitation Act and Title III of the Americans with Disabilities Act, as well as state law claims for negligence and breach of contract. Presently before the court is Defendants' motion to dismiss Plaintiff's complaint in its entirety, as well as Plaintiff's motion to strike an affidavit with exhibits that Defendants submitted in support of their motion (Dkt. Nos. 7 and 9). The parties have consented to this court's jurisdiction. *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73 (Dkt. No. 11). For the following reasons, both the motion to strike and motion to dismiss are GRANTED in part and DENIED in part.

# I.    BACKGROUND

### A.  Scope of the Record

Before moving to Defendants' motion to dismiss, it is necessary to clarify the scope of the record.  In conjunction with their motion to dismiss, Defendants submitted an affidavit from Dr. Jeanne Hart-Steffes, Ph.D., Vice President of Student Affairs and Dean of Students at WNEU, with twelve exhibits attached, including various paper and electronic correspondence (Ex. 1-2, 4-10), a no trespass order (Ex. 3), the WNEU Student Handbook (Ex. 11), and the 2016-2017 Parents' Guide to College (Ex. 12) (Dkt. No. 7-1).  As to the twelve exhibits, Hart-Steffes avers that each is a true and accurate copy of a document Plaintiff referred to in the Complaint.  Plaintiff has filed a motion to strike the affidavit and exhibits as not properly before the court on a motion to dismiss.

In deciding a Rule 12(b)(6) motion, a court is ordinarily limited to "consider[ing] only the 'facts alleged in the complaint, and exhibits attached thereto.'"  *Newman v. Lehman Bros. Holdings Inc.*, 901 F.3d 19, 25 (1st Cir. 2018) (quoting *Freeman v. Town of Hudson*, 714 F.3d 29, 35 (1st Cir. 2013)).  "However, there are some 'narrow exceptions' in which a court may, if it chooses, consider extrinsic documents, such as 'documents the authenticity of which are not disputed by the parties; ... official public records; ... documents central to the plaintiff's claim; [and] ... documents sufficiently referred to in the complaint' without turning the 12(b)(6) motion into a motion for summary judgment."  *Id*. (alteration in original) (quoting *Freeman*, 714 F.3d at 36).  Defendants rely on the latter two exceptions.  Regarding the Student Handbook and Parents' Guide, Defendants argue that the two documents are central to Plaintiff's breach of contract claim.  Regarding the various pieces of correspondence and the no trespass order,

Defendants argue that they are sufficiently referred to in the complaint insofar as they are referred to with specificity and Plaintiff relied on them in framing the complaint.

Defendants are correct that Plaintiff bases her breach of contract claim, at least in part, on the Student Handbook and the Parents' Guide, and, thus, the two documents are central to Plaintiff's claim. *See Am. Mgmt. & Admin. Corp. v. Solid Rock Wall Sys.*, 186 F. Supp. 2d 69, 71 (D.P.R. 2002) (holding that contracts on which the plaintiffs based their allegations of breach of contract were central to the plaintiffs' claim). "Nevertheless, even if a document is 'central to the plaintiff's claim,' its authenticity must also be accepted by both parties in order for a court to consider it on a motion to dismiss." *Pouliot v. Town of Fairfield*, 184 F. Supp. 2d 38, 47 (D. Me. 2002) (citing *Beddall v. State St. Bank & Trust Co.*, 137 F.3d 12, 17 (1st Cir. 1998) ("When ... a complaint's factual allegations are expressly linked to – and admittedly dependent upon – a document (*the authenticity of which is not challenged* ), ... the trial court can review [the document] in deciding a motion to dismiss under Rule 12(b)(6).") (emphasis added)). *See also Blackstone Realty LLC v. FDIC,* 244 F.3d 193, 195 n.2 (1st Cir.2001); *Fudge v. Penthouse Int'l, Ltd.,* 840 F.2d 1012, 1015 (1st Cir.1988). Here, Plaintiff makes a blanket statement that she challenges the authenticity of "most, if not all," of the documents attached to Hart-Steffes' affidavit (Dkt. No. 9 at 3). However, Plaintiff did not specifically challenge the authenticity of the Student Handbook or Parents' Guide in her motion to strike or at oral argument on the motion. Because the Student Handbook and Parents' Guide are central to Plaintiff's breach of contract claim and she did not seriously challenge their authenticity, the court will deny Plaintiff's motion to strike as to these two documents and will consider them on the motion to dismiss. *See Am. Mgmt. & Admin. Corp.*, 186 F. Supp. 2d at 71 (citing *Alt. Energy, Inc. v. St. Paul Fire & Marine Ins.*, 267 F.3d 30, 34 (1st Cir. 2001); *Beddall,* 137 F.3d at 16–17

(considering contracts on which the plaintiffs based their breach of contract claim on a motion to dismiss).

The paper and electronic correspondence and no trespass order attached to Hart-Steffes' affidavit, the authenticity of which Plaintiff does challenge, do not stand on equal footing. They are not "central" to any of Plaintiff's claims, nor are they "sufficiently referenced" to warrant incorporation. *Freeman*, 714 F.3d at 36-37. "The First Circuit has made clear that 'mere mention of [a document] in the complaint does not amount to sufficient reference." *Cosenza v. City of Worcester, Mass.*, 355 F. Supp. 3d 81, 87 (D. Mass. 2019) (citing *Freeman*, 714 F.3d at 36; *Goldman v. Belden*, 754 F.2d 1059, 1066 (2d Cir. 1985) ("[L]imited quotation does not constitute incorporation by reference.")). *See also Fudge*, 840 F.2d at 1015 (citing *Goldman*, 754 F.2d at 1066; *Seidel v. Public Service Co. of N.H.,* 616 F. Supp. 1342, 1353 (D.N.H.1985)) ("Clearly not every document referred to in a complaint may be considered incorporated by reference and thus introduced by the moving party in support of a motion to dismiss."). Accordingly, Plaintiff's motion to strike is granted insofar as it relates to the correspondence and no trespass order attached to Hart-Steffes' affidavit, and the court will not consider them in deciding the motion to dismiss.

A final note – it is within a court's discretion to convert a Rule 12(b)(6) motion to dismiss into a motion for summary judgment pursuant to Rule 56 and consider materials outside the pleadings. *Trans-Spec Truck Serv., Inc. v. Caterpillar Inc.*, 524 F.3d 315, 321 (1st Cir. 2008). Alternatively, a court can "ignore supplementary materials submitted with the motion papers and determine the motion under the Rule 12(b)(6) standard." *Id.* Here, the court exercises its discretion to decline to convert the motion to dismiss into a motion for summary judgment at this early stage of the litigation before any discovery has taken place. *See, e.g.,*

*Crosby Legacy Co., LLC v. TechnipFMC PLC*, No. CV 18-10814-MLW, 2019 WL 5588993, at *6 (D. Mass. Sept. 13, 2019) ("The wiser course is to allow the parties to engage in discovery, to see if the parties are able to narrow the factual disputes." (quoting *Levecque v. Argo Mktg. Grp., Inc.*, No. 2:14-cv-00218-JAW, 2015 WL 10044258, at *7 (D. Me. Feb. 25, 2015)).

B. Facts[1]

Shulse is 24-year-old man who was born with a severe case of spina bifida leading to a host of serious complications (Compl. ¶ 7). He has a programmable shunt behind ventricles in his brain and is paraplegic with limited hand dexterity (Compl. ¶ 7). He relies on a wheelchair for mobility and requires personal care attendants ("PCAs") to help him with the activities of daily living (Compl. ¶ 7). Shulse is incontinent of both bladder and bowel; he must be catheterized every 3-4 waking hours and is on a bowel program (Compl. ¶ 7). He has a history of depression and is treated with medication (Compl. ¶ 7). Shulse is hypoglycemic and has suffered several incidents of low blood sugar (Compl. ¶ 7).

Shulse has designated Plaintiff as his health care agent (Compl. ¶ 8). Plaintiff was also Shulse's main PCA (Compl. ¶ 55). At all relevant times, Shulse had an appointed legal guardian (Compl. ¶¶ 15, 110, 124).

In April 2015, Shulse and Plaintiff attended the National Association for College Admission Counseling in Springfield, Massachusetts (Compl. ¶ 9). While there, they met with Christopher Wystepek, WNEU Director of Undergraduate Admissions and Athletic Liaison, who spoke to Shulse about the accessibility and willingness of the school to work with individuals

---

[1] "Because this is a motion to dismiss and the [c]ourt must 'assume the truth of the well–pleaded facts and indulge all reasonable inferences therefrom,'" the facts are construed in the light most favorable to Plaintiff. *Doe v. Brown Univ.*, 166 F. Supp. 3d 177, 181 n.3 (D.R.I. 2016) (quoting *Arruda v. Sears, Roebuck & Co.*, 310 F.3d 13, 18 (1st Cir. 2002)).

with disabilities (Compl. ¶ 9).  In October 2015, Eric applied for admission to WNEU as a test optional student, and he was accepted into the College of Business the following month (Compl. ¶¶ 10-11).  Shulse quickly notified WNEU of his intention to enroll in Fall 2016 as a resident student (Compl. ¶ 12).

In March 2016, Tabitha Mancini ("Mancini"), with the WNEU Student Disability Services office ("SDS office"), assigned Shulse to the Commonwealth Hall to house himself and a PCA (Compl. ¶ 16).  Shulse was not offered any other option for housing, and he was charged $345.00 per year in extra fees for his accessible dormitory (Compl. ¶¶ 16, 167).  Nevertheless, the designated handicap accessible room Shulse was assigned was not large enough to accommodate an electric wheelchair, manual wheelchair, shower chair, and a PCA (Compl. ¶¶ 17, 167).

On August 25, 2016, Shulse moved into Room 151 in Commonwealth Hall (Compl. ¶ 23).  Plaintiff immediately notified Mancini of a number of modifications that had been suggested by Shulse's healthcare providers, but that had not been implemented (Compl. ¶¶ 23, 167).  Mancini informed Plaintiff that the modifications were not her responsibility and that Plaintiff would have to make them herself (Compl. ¶ 23).

Within days of his move onto campus, Shulse encountered a number of accessibility issues:  neither a Smart Pen (a handwriting recognition pen) nor a notetaker were available for the first day of classes despite Plaintiff and Shulse having requested them several months earlier to ensure effective communication; Shulse could not find his way to Health Services as there was no handicap signage on the campus or within the Science Center to locate an elevator; Shulse could not independently open the exterior door for the Department of Business in Churchill Hall; Shulse could not attend class as the elevators in Herman Hall building were not functioning and

his classroom was on the second floor; Shulse's classrooms did not have handicap accessible desks; Shulse could not reach the milk or soda machines in the cafeteria, nor could he navigate through the cafeteria as the tables were too close together; Shulse was told to go through the loading dock to get to the dietary freight elevator for dining services access on the second floor and there was no signage; Shulse was forced to keep his dorm room unlocked so that his PCAs could have access inside the room; and Shulse could not use any van on campus and could not rent a zip car because neither had hand controls or wheelchair access (Compl. ¶¶ 21, 24-32, 168-169, 184-190). Further, on August 29, 2016, Shulse and Plaintiff requested treatment for an infection, but they were told by health services and campus police that campus police would only provide transportation for medical needs to students without physical disabilities. Physically disabled students were required to call an ambulance at their own expense for both urgent and non-urgent care outside of WNEU clinic hours (Compl. ¶¶ 33, 169, 173). Plaintiff raised her concerns about these and other issues with WNEU (Compl. ¶ 34, 38). However, WNEU did not have a formal grievance procedure to appeal decisions about disability-related accommodations or issues (Compl. ¶¶ 34, 97, 170).

On September 3-4, 2016, WNEU offered the "Amazing Experience" to first-year students (Compl. ¶ 41). Shulse attended the New England Revolution game on September 3rd, but he was segregated from the rest of his classmates in a handicap section (Compl. ¶¶ 41, 171). He was unable to participate in any of the events on September 4th, because none were accessible (Compl. ¶ 41). Similarly, Parents' Weekend did not have any handicap accessible activities (Compl. ¶ 81). Shulse's view was also blocked at several school sporting events (Compl. ¶ 82).

On September 14, 2016, Plaintiff scheduled a meeting with Bonni Alpert, Director of the SDS office, because of academic concerns regarding Shulse (Compl. ¶ 46). During the meeting,

which was attended by Shulse, Plaintiff, Alpert, and Mancini, an argument developed regarding

Shulse's need for an emotional support dog (Compl. ¶¶ 47, 49, 50).  Plaintiff maintained that

Shulse's legal guardian had determined that the emotional support dog was medically necessary,

while Alpert took the position that Shulse said he did not need one and WNEU did not care if

Shulse had a guardian (Compl. ¶¶ 49-50).  At this point, Plaintiff stated, "this meeting is over,"

and walked out the door (Compl. ¶ 50).  Alpert contacted campus security, and, when Plaintiff

proceeded to her car to leave campus, she found her vehicle blocked in by three armed police

officers in campus security vehicles who asked her to go to the campus police office (Compl. ¶

52).

A police officer interviewed Plaintiff and informed her that Shulse wanted to have a no

trespassing order written against Plaintiff when, in fact, Shulse had never asked for such an order

(Compl. ¶¶ 53-54).  That same day, a No Trespass Order was issued against Plaintiff (Compl. ¶

55).  Plaintiff was not permitted to speak to Shulse, and she was escorted off the premises

(Compl. ¶ 55).  On September 19, 2016, Shulse requested that the No Trespass Order be

rescinded, but Chief Adam Woodrow, WNEU Director of Public Safety, denied the request on

September 20, 2016 (Comp. ¶ 61).  The No Trespass Order remained in place until WNEU

removed it on April 17, 2017 (Compl. ¶ 126).

In mid-October 2016, representatives from multiple departments at WNEU met regarding

Shulse's enrollment at the University (Compl. ¶ 72).  During the meeting, WNEU representatives

recommended that Shulse withdraw, but Shulse refused (Compl. ¶ 72).  WNEU representatives

then suggested that Shulse drop two classes, but they failed to inform him that if he dropped the

two classes, he could no longer live on campus because he would be below 12 credits and would

have to become a commuter student (Compl. ¶¶ 72, 93).  Plaintiff was advised of this

requirement on November 4, 2016 by WNEU Attorney Cheryl Smith (Compl. ¶ 93).  That same

day, Shulse emailed WNEU representatives expressing his rights to an education at WNEU

(Compl. ¶ 96).

On December 12, 2016, Michelle McGrath, NP, with the WNEU health clinic, prescribed

Shulse medication for a urinary tract infection ("UTI") without doing any diagnostic testing or

contacting Shulse's court appointed legal guardian (Compl. ¶¶ 100-101).  In doing so, she failed

to follow the standard of care for recurrent UTIs in a patient with neurogenic bladder secondary

to spina bifida (Compl. ¶ 103).  Shulse also was not provided written discharge materials, and his

primary care provider was not provided continuity of care paperwork (Compl. ¶¶ 104-105).

On December 21, 2016, WNEU sent a letter to Shulse informing him that he was placed

on academic suspension for the Spring 2017 semester for falling below 12 credits (Compl. ¶

112).  Shulse appealed the suspension, but his appeal was denied (Compl. ¶¶ 113, 116).

Starting in late January 2017, Shulse began to experience a number of medical

complications.  On January 24, 2017, a CT scan showed that he had a renal stone (Compl. ¶

121).  On February 14, 2017, Shulse's programmable shunt failed, requiring emergency surgery

at Boston Children's Hospital (Compl. ¶ 122).  Plaintiff had expressed concerns to WNEU about

his shunt failing on September 15, 2016 (Compl. ¶ 58).  On February 21, 2017, Shulse had

bladder surgery to remove a foreign object at Southern Vermont Medical Center (Compl. ¶ 123).

In mid-April 2017, Shulse went home for Spring Break and was found to have two large wounds

– one on his abdomen and one on his leg – from lack of care at WNEU (Compl. ¶ 125).  Shulse

had been without PCAs for approximately 14 hours a day after Plaintiff, his primary PCA, was

banned from campus, forcing him to be either bed or wheelchair bound for extended periods

(Compl. ¶ 125).  WNEU had been warned of Shulse's high risk for skin breakdown before

Shulse started at WNEU (Compl. ¶ 20).  On April 27, 2017, Shulse requested a medical leave of absence from WNEU (Compl. ¶ 132).

On May 3, 2017, Shulse was seen by The Center for Wound Care for five wounds (Compl. ¶ 137).

On May 21, 2017, Shulse was admitted to Albany Medical Center, where he required emergency surgery to remove a large kidney stone lodged in his ureter that resulted in life-threatening septic shock (Compl. ¶¶ 143).  Shulse was hospitalized with sepsis for ten days, with seven of the days being in the intensive care unit (Compl. ¶ 142).  Shulse's urologist attributed the kidney stone to "lack of hydration, poor food choices and lack of activity" over the previous year (Compl. ¶ 143).

On May 22, 2017, WNEU sent Shulse a letter informing him that he was academically suspended again because he did not maintain a 2.0 GPA or complete 12 credits (Compl. ¶ 144).  He was given until June 12, 2017 to appeal the decision, but he failed to meet the deadline due to his being hospitalized (Compl. ¶¶ 145-150).

On June 5, 2017, Shulse presented to Southern Vermont Emergency Room for tachycardia (Compl. ¶ 146).   Shulse was found to have blood in his urine and was transferred to Albany Medical Center for intravenous antibiotics and kidney stone removal (Compl. ¶ 147).  On June 19, 2017, Shulse presented to Berkshire Medical Center Emergency Room with blood in his Foley catheter (Compl. ¶ 149).

During the Fall 2017 semester, Shulse took 2 credits at Greenfield Community College (Compl. ¶ 157).  He was unable to take more due to medical issues requiring hospitalization (Compl. ¶ 157).  In early December 2017, Shulse requested academic reinstatement at WNEU, but his request was denied (Compl. ¶¶ 156, 158).  On August 1, 2019, Shulse attempted to use

the WNEU website to contact the administration and file a formal grievance (Compl. ¶ 159).

However, WNEU failed to make reasonable modifications to its website to allow individuals

with poor hand function and fine motor control secondary to paraplegia, like Shulse, to utilize

the website (Compl. ¶¶ 159, 174).

## II.    LEGAL STANDARD

"A Rule 12(b)(6) motion to dismiss challenges a party's complaint for failing to state a

claim." *Ngomba v. Olee*, CIVIL ACTION NO. 18-11352-MPK, 2020 WL 107969, at *2 (D.

Mass. Jan. 9, 2020).  In ruling on the motion, a court must "treat all well-pleaded facts in the

complaint as true and draw all reasonable inferences in favor of the plaintiff." *In re Fin.*

*Oversight & Mgmt. Bd. for P.R.*, 919 F.3d 121, 127 (1st Cir. 2019) (citing *Ocasio-Hernández*

*v. Fortuño-Burset*, 640 F.3d 1, 7 (1st Cir. 2011)).  "In order to survive a motion to dismiss under

Rule 12(b)(6), the plaintiff must provide 'enough facts to state a claim to relief that is plausible

on its face.'" *Ngomba,* 2020 WL 107969, at *2 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S.

544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that

allows the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

"[L]abels and [legal] conclusions, and a formulaic recitation of the elements of a cause of action

...." are insufficient to "raise a right to relief above the speculative level." *Twombly,* 550 U.S. at

555.  "Simply put, the court should assume that well-pleaded facts are genuine and then

determine whether such facts state a plausible claim for relief." *Ngomba,* 2020 WL 107969, at

*2 (citing *Iqbal*, 556 U.S. at 679).

### III.    DISCUSSION

#### A. Claims against WNEU

##### 1.    Section 504 of the Rehabilitation Act (29 U.S.C. § 794)

Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance...." 29 U.S.C. § 794(a).  A Section 504 claim requires a plaintiff to plausibly allege four elements:  (1) that he is disabled; (2) that he sought services from a federally funded entity; (3) that he was "otherwise qualified" to receive those services; and (4) that he was denied those services "solely by reason of … his disability." *Lesley v. Hee Man Chie*, 250 F.3d 47, 52-53 (1st Cir. 2001)).  Defendants concede that Plaintiff has adequately alleged the first two elements – that Shulse is disabled and that he sought services from WNEU, a federally funded entity – and they make no argument regarding the fourth – that Shulse was denied WNEU's services solely because of his disability.  Hence, the only question before the court is whether Plaintiff has plausibly alleged that he is "otherwise qualified."

"'An otherwise qualified person is one who is able to meet all of a program's requirements in spite of his handicap.'" *Wynne v. Tufts Univ. Sch. of Med.*, 932 F.2d 19, 22 (1st Cir. 1991) (quoting *Se. Cmty. Coll. v. Davis*, 442 U.S. 397, 406 (1979)).  When determining if a plaintiff is otherwise qualified, "it is necessary to take into account the extent to which reasonable accommodations that will satisfy the legitimate interests of both the school and the student are (or are not) available and, if such accommodations exist, the extent to which the institution explored those alternatives."  *Wynne v. Tufts Univ. Sch. of Med.*, 976 F.2d 791, 792 (1st Cir. 1992) ("*Wynne II*") (citing *Wynne,* 932 F.2d at 24–26).  Reasonable accommodations

are those which do not require a modification of the essential nature of the program or impose an undue burden on the recipient of federal funds. *Wynne*, 932 F.2d at 25.

Defendants argue that Shulse has not plausibly alleged that he was "otherwise qualified" because, according to Defendants, the complaint demonstrates that WNEU provided Shulse with all of the accommodations he requested and that, notwithstanding those accommodations, Shulse failed to maintain satisfactory academic progress. The accommodations Defendants identify are the provision of note takers, "interactive discussions with University administrators," and permitting Shulse to enroll in only two courses. Plaintiff counters that when Shulse requested note takers he was unilaterally told to use Note-Taker Express, that Defendants misrepresent the discussions Shulse had with University administrators as alleged in the complaint, and that Shulse did not request a reduced course load, but rather, WNEU told him to drop two courses. In addition, Plaintiff argues that Shulse was not properly trained on the use of a Smart pen until three weeks into the first semester.

The court finds that, drawing all inferences in favor of Plaintiff as it must on a motion to dismiss, Plaintiff has alleged facts plausibly supporting that Shulse could meet all of WNEU's program requirements with reasonable accommodations. As an initial matter, Shulse's claimed failure to maintain satisfactory academic progress is not set forth in the complaint, but rather presents a factual question not suitable for resolution on a motion to dismiss. Further, Plaintiff has alleged that Shulse gained admission to WNEU on the basis of his academic achievements, supporting an inference that he was "otherwise qualified" for admission to the school. Plaintiff has further alleged that, several months before Shulse started at WNEU, Plaintiff and Shulse requested that he be provided with assistive technology, in the form of a Smart Pen, or a note taker to help ensure effective communication because Shulse is unable to use his hands to take

notes.  Despite this request, neither auxiliary aid was in place on the first day of classes.  Plaintiff alleges that WNEU's failure to provide the requested accommodation in a timely fashion was a significant contributing factor for his falling behind with his academic work in most of his classes.  Plaintiff has also alleged that he could not attend at least one of his classes at least some of the time due to a non-functioning elevator.  Thus, even if Shulse failed to make satisfactory academic progress as claimed by Defendants, Plaintiff may be able to prove that Shulse's performance would have improved had Shulse been provided with a Smart Pen or a note taker and had Shulse been able to attend all of his classes.

It is true as Defendants point out that, in considering whether someone is "otherwise qualified" to participate in a post-secondary academic program, a certain degree of deference is owed to the judgement of an academic institution.  *Regents of Univ. of Mich. v. Ewing,* 474 U.S. 214, 225 (1985).  "A university is entitled wide discretion in making judgments as to the academic performance of its students, so long as its behavior is not so arbitrary or irrational as to not constitute an exercise of professional judgment."  *el Kouni v. Trs. of Boston Univ.*, 169 F. Supp. 2d 1, 4 (D. Mass. 2001) (citing *Wynne,* 932 F.2d at 25–26; *Doe v. New York Univ.,* 666 F.2d 761, 776 (2d Cir.1981)).  "However, this deference does not override this Court's duty to draw all reasonable inference in favor of the non-moving party at the motion to dismiss stage."  *Weiss v. Rutgers Univ.*, Civ. Action No. 12-6834, 2014 WL 2608201, at *5 (D.N.J. June 10, 2014) (declining to grant academic deference to the defendant school in finding the plaintiff not academically qualified on a motion to dismiss absent a fuller record).  Thus, contrary to Defendants' argument, the court finds that Plaintiff has plausibly alleged that Shulse was "otherwise qualified" for WNEU's program, and Defendants' motion to dismiss Plaintiff's Section 504 claim against WNEU is denied.

2.   Title III of the Americans with Disabilities Act (42 U.S.C. § 1281 *et seq.*)

Title III of the ADA provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a public accommodation."  42 U.S.C. § 12182(a).  "To state a claim under the ADA, a plaintiff must establish (1) [that] he or she is disabled within the meaning of the ADA; (2) that the defendants own, lease, or operate a place of public accommodation; and (3) that the defendants discriminated against the plaintiff within the meaning of the ADA."  *Marradi v. K&W Realty Inv. LLC*, 212 F. Supp. 3d 239, 245 (D. Mass. 2016) (citing *Jacobs v. Soars*, No. 14–cv–12536–LTS, 2014 WL 7330762, at *4 (D. Mass. Dec. 19, 2014) (adopted by *Jacobs v. Soars*, No. 14–cv–12536–LTS, 2014 WL 7335771, at *4 (D. Mass. Dec. 19, 2014))).  Defendants do not dispute that Plaintiff has plausibly alleged the first two elements – that Shulse is disabled within the meaning of the ADA and that WNEU owns, leases, or operates a place of public accommodation.  Defendants challenge the third element, but only as to Shulse's dismissal from the program, arguing that Plaintiff is unable to prove that Shulse was dismissed "because of his disability."  Defendants again rely on Shulse's asserted failure to meet its academic standards despite the provision of various accommodations.  Once again, Shulse's asserted failure to make satisfactory academic progress, Defendants' articulated non-discriminatory justification, is not established by the complaint.  Furthermore, Defendants fail to recognize that Plaintiff's ADA claim is not limited to challenging his dismissal, but also encompasses WNEU's failure to provide reasonable accommodations and auxiliary aids and services, 42 U.S.C. § 12182(b)(2)(A)(iii), as well as multiple physical barriers to handicap accessibility on WNEU's campus, 42 U.S.C. §§ 12182(b)(2)(A)(iv); 12183(a)(2).  Defendants

offer no argument for why these aspects of Plaintiff's ADA claim warrant dismissal.  Therefore,

Defendants motion to dismiss Plaintiff's ADA claim against WNEU is denied.

        3.  <u>Negligence</u>

Under Massachusetts law, "'[t]o prevail on a negligence claim, a plaintiff must prove that

the defendant owed the plaintiff a duty of reasonable care, that the defendant [committed a

breach of] this duty, that damage resulted, and that there was a causal relation between the

breach of the duty and the damage.'"  *Nguyen v. Mass. Inst. of Tech.*, 96 N.E.3d 128, 139 (Mass.

2018) (quoting *Jupin v. Kask*, 849 N.E.2d 829 (Mass. 2006)).  Defendants argue that Plaintiff's

negligence claim fails on the first prong because WNEU did not owe a cognizable duty to

Shulse.  Plaintiff does not identify a particular duty in her complaint, but in her motion opposing

dismissal, Plaintiff invokes a duty to protect Shulse from foreseeable medical harm.  For support,

the Plaintiff relies on the recent Supreme Judicial Court opinion in *Nguyen*, which held that a

university has a special relationship with a student and a corresponding duty to take reasonable

measures to prevent his or her suicide if it the university has actual knowledge of the student's

suicide attempt that occurred while enrolled at the university or shortly before matriculation, or

of a student's stated plan or intentions to commit suicide.[2]  *Id*. at 142-43.  Plaintiff argues that

WNEU's duty to protect Shulse from foreseeable medical harm is akin to the suicide prevention

duty announced in *Nguyen*.

In *Nguyen*, the court started its analysis with the general principle that "'we do not owe

others a duty to take action to rescue or protect them from conditions we have not created.'"  *Id*.

---

[2] The reasonable measures a university must take once the duty is triggered are "limited to
initiating the university's suicide prevention protocol, and if the school has no such protocol,
arranging for clinical care by trained medical professionals or, if such care is refused, alerting the
student's emergency contact."  *Id*. at 146.

at 140 (quoting *Cremis v. Clancy*, 612 N.E.2d 1183 (Mass. 1993) (O'Connor, J., concurring)).

However, the SJC recognized that, notwithstanding this general principle, a school might have a

"special relationship" with its students that could give rise to a duty to prevent suicide.  *Id*.

Specifically, the court cited to the Restatement (Third) of Torts, which states that "[a]n actor in a

special relationship with another owes a duty of reasonable care with regard to risks that arise

within the scope of the relationship," including "a school with its students"

*Id*. (citing Restatement (Third) of Torts: Liability for Physical and Emotional Harm §§ 40(a) and

(b)(5)).  The court noted that universities have "complex relationships" with their students:

> Students are adults but often young and vulnerable; their right to
> privacy and their desire for independence may conflict with their
> immaturity and need for protection.  As for universities, their
> primary mission is to educate and they no longer are acting in loco
> parentis, but they still have wide-ranging involvement in the lives
> of their students.

*Id*. at 141-42 (citing *Mullins v. Pine Manor Coll.*, 449 N.E.2d 331, 336 (Mass. 1983); *Bradshaw

v. Rawlings*, 612 F.2d 135, 138 (3d Cir. 1979)).  In analyzing whether a duty to prevent suicide

falls within the scope of this complex university-student relationship, the court considered "a

number of factors used to delineate duties in tort law," including, primarily, foreseeability, as

well as reasonable reliance by the plaintiff on the defendant, the degree of certainty of harm, the

burden on the defendant to take reasonable steps to prevent the injury, some kind of mutual

dependence by the plaintiff and defendant upon each other, moral blameworthiness of the

defendant's conduct in failing to act, and social policy considerations in placing the economic

burden of the loss on the defendant.  *Id*. at 142.

Taking these considerations into account, the court concluded that a university does have

the limited duty set forth below to act to prevent a student's suicide.

> Where a student has attempted suicide while enrolled at the
> university or recently before matriculation, or has stated plans or
> intentions to commit suicide, suicide is sufficiently foreseeable as
> the law has defined the term, even for university non-clinicians
> without medical training.  Reliance of the student on the university
> for assistance, at least for students living in dormitories or away
> from their parents or guardians, is also foreseeable.  Universities
> are in the best, it not the only, position to assist.  *See Mullins,
> supra*.  They also have 'fostered' expectations, at least for their
> residential students, that reasonable care will be exercised to
> protect them from harm.  *Id*.

*Nguyen*, 96 N.E.3d at 144.  The court recognized that the burden placed on the university is not

insubstantial, but neither is the financial benefit received from the student's tuition.  Finally,

"moral blameworthiness on the part of the university in failing to act to intervene to save a young

person's life, when it is within the university's knowledge and power to do so, is understood and

accepted by our society.  *Id*.  More recently, the Supreme Judicial Court examined the extent of

an educational institution's duty to protect an intoxicated student from sexual assault.  *See*

*generally Helfman v. Ne. Univ.*, SJC-12787, 2020 WL 4280070 (Mass. July 27, 2020).  The

court reaffirmed the existence of a special relationship between the educational institution and its

students founded on the expectation that colleges and universities will exercise reasonable case

to protect students from foreseeable harm.  *Id.* at *5.

Application of these principles to the case at bar, at least at the motion to dismiss stage,

counsels in favor of allowing the negligence claim to proceed on a special relationship theory.

Contrary to Defendants' assertion, the law is clear that WNEU stood in a special relationship to

Shulse that gave rise to at least certain duties to protect him from foreseeable harm, which may

include reasonably foreseeable medical harm.  Plaintiff has plausibly alleged that the harm to

Shulse was foreseeable in that WNEU was on notice of Shulse's complex medical needs,

including, for example, that Plaintiff was concerned that Shulse's programmable shunt was

failing and that Shulse was at increased risk for skin infections.  The foreseeability of harm, as well as Shulse's reliance on WNEU, which the *Nguyen* court also recognized as foreseeable, arguably increased when WNEU trespassed Plaintiff, Shulse's primary PCA, from the campus for approximately seven months notwithstanding Shulse's request to rescind the no trespass order.  As recognized in *Nguyen*, the burden placed on WNEU is not small, but nor is the financial benefit WNEU received from Shulse's enrollment.  Thus, the court cannot conclude as a matter of law that WNEU did not owe Shulse a duty of care arising from its special relationship to Shulse to prevent reasonably foreseeable medical harm.

Defendants are correct that the *Nguyen* court rejected the plaintiff's other theory that, in addition to the duty arising from the special university-student relationship, the defendant university and officials also had a duty stemming from their voluntary assumption of a duty of care.  *Id.* at 147.  The SJC reasoned that, while a "'a duty voluntarily assumed must be performed with due care,'" the duty "can lead to liability only where a 'failure to exercise such care increases the risk of such harm,' or 'the harm is suffered because of the other's reliance upon the undertaking."  *Id.* (citing *Mullins*, 449 N.E.2d at 336).  The *Nguyen* court rejected liability premised on assumption of a duty of care finding that, while the defendant university offered mental health student support services, there was no evidence that the services increased the deceased student's risk of suicide or that the deceased student relied on those services.  *Id.* at 147-48.  The difference is that *Nguyen* was decided on a developed factual record on summary judgment.  Here, at the motion to dismiss stage, the record is not clear whether WNEU voluntarily assumed a duty of care by offering health services to Shulse, or whether the failure to exercise such care increased Shulse's risk of harm or that Shulse was harmed by his reliance

upon WNEU's undertaking.  Thus, Plaintiff also may proceed on a voluntary assumption of duty

theory.

Finally, even beyond the more nuanced duties arising from the special university- student

relationship and from a voluntary assumption of a duty of care, Defendants acknowledge that the

University would have a duty to provide medical services with reasonable care.  Plaintiff has

plausibly alleged a breach of that duty at least when Shulse was treated at the WNEU medical

center for a UTI in December 2016.  Thus, Defendants' motion to dismiss Plaintiff's negligence

claim against WNEU is denied.

### 4.  Breach of Contract

"To state a claim for breach of contract under Massachusetts law, a plaintiff must allege,

at a minimum, that there was a valid contract, that the defendant breached its duties under its

contractual agreement, and that the breach caused the plaintiff damage."  *Guckenberger v.*

*Boston Univ.*, 974 F. Supp. 106, 150 (D. Mass. 1997) ("*Guckenberger II*") (quoting

*Guckenberger v. Boston Univ.,* 957 F. Supp. 306, 316 (D.Mass.1997)).  Plaintiff alleges that

WNEU violated provisions of the Student Handbook and the Parents' Guide in which WNEU

agreed to provide Shulse with an academic environment free from discrimination consistent with

applicable federal and state anti-discrimination laws and to provide all reasonable and necessary

health services.  Plaintiff cites *Guckenberger II* for the proposition that "[u]nder Massachusetts

law, the promise, offer, or commitment that forms the basis of a valid contract can be derived

from statements in handbooks, policy manuals, brochures, catalogs, advertisements, and other

promotional materials."  *Id*., 974 F. Supp. at 150 (citing *Russell v. Salve Regina Coll.,* 890 F.2d

484, 488 (1st Cir.1989), *rev'd on other grounds,* 499 U.S. 225, (1991), *and reinstated on*

*remand,* 938 F.2d 315 (1st Cir.1991)).  While Defendants note that "the question of whether [a

student handbook] always constitutes a contract is, arguably, an unsettled issue under

Massachusetts law," *Walker v. President & Fellows of Harvard Coll.*, 840 F.3d 57, 61 (1st Cir.

2016), they do not press the point, instead focusing their challenge on the sufficiency of

Plaintiff's allegations of breach.  Specifically, Defendants argue that WNEU never denied Shulse

an accommodation when one was requested through the school's SDS office and further that

nowhere in the Student Handbook or Parents' Guide did WNEU promise to provide special

medical treatment for a student suffering from complex health issues.  Defendant seems to imply

that it was Shulse who breached the contract through his unwillingness or inability to maintain

satisfactory academic progress.  Plaintiff counters that WNEU breached its contractual duties by

failing to provide equal education opportunities for Shulse and that WNEU's argument otherwise

presents factual matters that are not appropriate for resolution on a motion to dismiss.

The court finds that Plaintiff has plausibly alleged that WNEU breached its contractual

obligation to provide Shulse with an academic environment free from discrimination as it agreed

to do in the Student Handbook and Parents' Guide.  "In reviewing a student's breach of contract

claim against his or her university, [the court] employ[s] a reasonable expectations standard in

interpreting the relevant contracts."  *Doe v. Trs. of Boston Coll.*, 892 F.3d 67, 80 (1st Cir. 2018)

(citing *Walker*, 840 F.3d at 61).  The court asks "'what meaning the party making the

manifestation, the university, should reasonably expect the other party[, the student,] to give

it." *Id*. (quoting *Walker*, 840 F.3d at 61).  "'[I]f the facts show that the university has "failed to

meet [the student's] reasonable expectations'" the university has committed a breach.'" *Id*.

(quoting *Walker*, 840 F.3d at 61-62).  In both the Student Handbook and the Parents' Guide,

WNEU states that it has an SDS office.  The Student Handbook provides that the SDS office

"works with students and faculty to ensure that necessary services and accommodations are

provided in a timely and efficient manner."  In the Parents' Guide, the SDS office is identified as "offer[ing] services for students with disabilities based on current documentation and academic need."  In the Student Handbook, WNEU quotes from Title III of the ADA and promises that it "adheres to the stipulations of this Act."  Finally, in both the Student Handbook and the Parents' Guide, WNEU cites to a non-discrimination policy, promising that it does not discriminate, including on the basis of disability.  Taken together, these provisions plausibly support Plaintiff's reasonable expectation that WNEU would provide an environment free from disability discrimination, including by the provision of reasonable accommodations in a timely and effective manner.  Plaintiff's complaint is replete with allegations that WNEU failed to fulfill this contractual obligation.  Defendants' argument that WNEU never denied a reasonable accommodation when one was requested through the SDS office and, again, that Shulse failed to make satisfactory academic progress despite these accommodations, presents matters outside the pleadings that cannot be resolved absent a developed factual record.

The court also finds that Plaintiff has stated a claim that WNEU failed to provide reasonable and necessary health services.  In the Student Handbook, WNEU states that it provides health services offering "[c]omprehensive health care . . . while undergraduate classes are in session."  The Parents' Guide also highlights the health services department.  While this claim is thinner, the court nevertheless finds that Plaintiff has at least plausibly alleged that she had an expectation created by the provisions of the Student Handbook and Parents' Guide to reasonable and adequate health services and that WNEU breached its duty to provide those services to Shulse.  Accordingly, Defendants' motion to dismiss Plaintiff's breach of contract claim against WNEU is denied.

B. <u>Claims Against Caprio and the Board</u>

Defendants have also requested dismissal of Plaintiff's claims against Caprio and the Board. Defendants argue that Plaintiff fails to allege any specific wrongdoing or harm caused by Caprio or the Board. Further, as to the Board, Defendants invoke Mass. Gen. Laws ch. 231, § 85W, which provides certain limited protection from liability for officers and directors of non-profit corporations in Massachusetts, as well as 42 U.S.C. § 14503, the federal Volunteer Protection Act. Finally, they invoke Mass. Gen. Laws ch. 180, § 6C, which sets out the standard of duty owed by corporate officers and directors of nonprofit corporations. Defendants also raise a number of claim-specific arguments. Regarding Section 504 and Title III, Defendants rely on *Coddington v. Adelphi Univ.*, 45 F. Supp. 2d 211, 217 (E.D.N.Y. 1999), for the proposition that Congress did not intend "to impose individual liability upon every person that has made a decision regarding plaintiff's education." As to the breach of contract claim, Defendants argue that neither Caprio nor the Board are parties to the alleged contract.

Nowhere in her opposition does Plaintiff respond to Defendants' arguments that the Board is shielded from liability under Mass. Gen. Laws ch. 231, § 85W, the federal Volunteer Protection Act, or Mass. Gen. Laws ch. 180, § 6C. Further, Plaintiff offers no argument for why she has plausibly alleged any of her four claims against the Board, and, with respect to Caprio, she only argues that he can be held personally liable for the Title III violations.[3]

The court finds that Plaintiff has not plausibly stated any of her four claims against Caprio or the Board. While Plaintiff includes Caprio and the Board as defendants in the caption of her complaint, Caprio appears only twice in the ensuing 38 pages and the Board not at all.

---

[3] In the section heading, Plaintiff states that the Board and Caprio can be held liable for Section 504 and Title III violations, but none of the argument is devoted to Board liability or Caprio's potential liability under Section 504. Plaintiff only discusses individual liability under Title III.

The two mentions of Caprio relate to a single factual allegation, namely that he failed to respond to Plaintiff when she contacted him on August 30, 2016 regarding the lack of a formal grievance procedure to appeal decisions about disability-related accommodations or issues (Compl. ¶¶ 34, 170).  Further, each of the four claims of Plaintiff's complaint are asserted against WNEU alone.  With respect to Plaintiff's two federal claims – for violation of Section 504 of the Rehabilitation Act and Title III of the ADA – Plaintiff speaks only of violations by "Defendant" in the singular or by WNEU specifically (Compl. ¶¶ 165, 168, 173, 175, 177, 182, 183, 192,193, 194, 196, 197).  She does not identify any Section 504 or Title III violations by Caprio or the Board.  In addition, Plaintiff alleges that only WNEU is a recipient of federal financial assistance (for Section 504 purposes) and operates a place of public accommodation (as required by Title III) (Compl. ¶¶ 162, 180).  Finally, Plaintiff requests declaratory and injunctive relief against WNEU only (Compl. ¶ 199(a)-(b).  In her two state law claims – for negligence and breach of contract – Plaintiff refers only to negligence and breach by WNEU.  Further, as set forth above, the only argument Plaintiff makes in her opposition is that Caprio can be held liable for violations of Title III.  For this, she relies primarily on *Guckenberger*, 957 F. Supp. at 323, in which the court held that a former university president and current chancellor could be found to "operate" the institution for purposes of Title III liability.  However, the plaintiffs in *Guckenberger* included detailed factual allegations in the complaint about the president-turned-chancellor, including that he was president during the formation of the university's policy concerning students with learning disabilities (which were the subject of the ADA claims), that he was responsible for insuring that the university complied with state and federal law, and that, although he had been made aware of the students' "illegal treatment," he "nevertheless knowingly . . . participated in carrying out and continuing the discriminatory policies of [the] University."  *Id*. at 323.  Here,

Plaintiff has made no such allegations that would support an inference that Caprio is "in a position of authority and discretion such that he may be deemed to 'operate' the university within the meaning of the ADA." *Id.* Accordingly, to the extent that Plaintiff intended to assert any of her four claims against Caprio or the Board, they are dismissed.[4]

## IV.    CONCLUSION

For the above-stated reasons, Plaintiff's motion to strike (Dkt. No. 9) is GRANTED in part and DENIED in part and Defendants' motion to dismiss (Dkt. No. 7) is GRANTED in part and DENIED in part.

It is so ordered.

/s/ Katherine A. Robertson_____
KATHERINE A. ROBERTSON
United States Magistrate Judge

DATED: August 4, 2020

---

[4] In arriving at this decision, the court does not reach Defendants' arguments under Mass. Gen. Laws ch. 231, § 85W, the federal Volunteer Protection Act, or Mass. Gen. Laws ch. 180, § 6C.